1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| DAVID KELLY, derivatively on behalf of F5, INC., <br><br>           Plaintiff, <br><br>     v. <br><br> FRANCOIS LOCOH-DONOU, ALAN J. HIGGINSON, MICHAEL L. DREYER, ELIZABETH L. BUSE, NIKHIL MEHTA, MARIANNE N. BUDNIK, MICHEL COMBES, TAMI. A. ERWIN, MAYA MCREYNOLDS, JULIE GONZALEZ, MICHAEL MONTOYA, EDWARD COOPER WERNER, KUNAL ANAND, and THOMAS DEAN FOUNTAIN, <br>           Defendants, <br><br>     and <br><br> F5, INC., <br><br>           Nominal Defendant. | Civil Action No.  2:26-cv-00435 <br><br><br> **COMPLAINT** <br><br><br> **JURY TRIAL DEMANDED** |

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 1
Case No.  2:26-cv-00435

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

1.     Plaintiff David Kelly ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant F5, Inc. ("F5" or the "Company") against certain current and/or former members of its Board of Directors (the "Board") and executive officers, seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment.

### NATURE OF THE ACTION

2.     According to its public filings, F5 is a global multicloud application security and delivery company which enables customers to deploy, secure, and operate applications on-premises or via public cloud. The Company operates through three major product portfolios: F5 Distributed Cloud Services, F5 NGINX, and F5 BIG-IP.

3.     As alleged herein, the Individual Defendants (defined herein) provided investors with material information concerning F5's cybersecurity capabilities and effectiveness. The Individual Defendants' statements included, among other things, confidence in the Company's security coverage; and emphasis on the importance of effective security measures to its customers.  These statements included, among other things, confidence in the Company's ability to uniquely address newly developing security concerns, provide best-in-class security offerings, and overall protect its clients' data while capitalizing on the market potential for enhanced security offerings.

4.     While these statements were being made, the Individual Defendants made, or knowingly failed to correct, materially false and misleading statements and/or concealing material adverse facts concerning the true state of F5's security capabilities; notably, that it was not truly equipped to safely secure data for its clients as F5 itself was, for all relevant times, experiencing a significant security breach (the "Security Breach") of some of its key offerings and, further, that the revelation of this breach would significantly impact F5's potential to capitalize on the security market.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 2
Case No.  2:26-cv-00435

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566

1    5.    Investors began to question the veracity of Defendants' public statements on

2  October 15, 2025. In pertinent part, Defendants announced a "long-term, persistent" breach to its

3  systems, during which the Company's BIG-IP product development and engineering knowledge

4  management platforms were compromised, including the BIG-IP source code.

5    6.    Investors and analysts reacted immediately to F5's revelation. The price of F5's

6  common stock declined from a closing market price of $343.17 per share on October 14, 2025,

7  to $295.35 per share on October 16, 2025, a decline of about 13.9% in the span of just two days.

8    7.    Even after this information came to light the Individual Defendants continued to

9  mislead investors.  Defendants did not present information related to the Company's updated

10  financial projections, a potential scope of client exposure, or the cost or significance of the

11  remedial measures underway, planned, or otherwise contemplated.  At the time of the disclosure

12  Defendants claimed they were still evaluating the impact of the incident on its financial conditions

13  and operations.

14    8.    The full truth finally emerged on October 27, 2025 when the Individual

15  Defendants caused F5 to announce their fourth quarter fiscal year 2025 results after the market

16  closed, providing significantly below-market growth expectations for fiscal 2026 due in

17  significant part to the Security Breach as the Company announced expected reductions to sales

18  and renewals, elongated sales cycles, terminated projections, and increased expenses attributed

19  to ongoing remediation efforts.  Pertinently, Defendants also disclosed that BIG-IP, the product

20  that was the subject of the Security Breach, is the company's highest revenue product, elevating

21  the scope of the impact from the original disclosure as F5 does not otherwise provide revenue

22  contributions by product line.

23    9.    Investors and analysts again reacted promptly to F5's revelations. The price of

24  F5's common stock declined dramatically. From a closing market price of $290.41 per share on

25  October 27, 2025, F5's stock price fell to $258.76 per share on October 28, 2025, a decline of an

26  additional 10.9% in the span of two days.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 3
Case No.  2:26-cv-00435

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566

10.    Accordingly, the Company has been damaged.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiffs and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.  This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. §1367(a).  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

12.    Venue is proper in this district because a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this district.  One or more of the defendants either resides in or maintains executive offices in this district, and defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## THE PARTIES

13.    Plaintiff is a current shareholder of F5 and has continuously held F5 stock since September 2024.  Plaintiff is a citizen of Pennsylvania.

14.    F5, Inc. is a Washington corporation with its principal executive offices located at 801 5th Avenue, Seattle, Washington 98104.

15.    Defendant Francois Locoh-Donou ("Locoh-Donou") has served as the President, Chief Executive Officer, and director of F5 since 2017. Upon information and belief, Locoh-Donou is a citizen of Washington.

16.    Defendant Alan J. Higginson ("Higginson") has served as a director of F5 since 2015. Higginson serves as Chairman of the Board.  Upon information and belief Defendant Higginson is a citizen of Montana.

17.    Defendant Michael L. Dreyer ("Dreyer") has served as a director of F5 since 2012. Upon information and belief Defendant Breyer is a citizen of California.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 4
Case No.  2:26-cv-00435

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566

18.    Defendant Elizabeth L. Buse ("Buse") has served as a director of F5 since 2020. Upon information and belief Defendant Buse is a citizen of California.

19.    Defendant Nikhil Mehta ("Mehta") has served as a director of F5 since 2021. Upon information and belief Defendant Mehta is a citizen of California.

20.    Defendant Marianne N. Budnik ("Budnik") has served as a director of F5 since 2022.  Upon information and belief Budnik is a citizen of Massachusetts.

21.    Defendant Michel Combes ("Combes") has served as a director of F5 since 2023. Previously, Combes serves as a director F5 from 2018 through 2021. Upon information and belief Defendant Combes is a citizen of Florida.

22.    Defendant Tami A. Erwin ("Irwin") has served as a director of F5 since 2023. Upon information and belief Defendant Erwin is a citizen of Colorado

23.    Defendant Maya A. McReynolds ("McReynolds") has served as a director of F5 since 2024. Upon information and belief Defendant McReynolds is a citizen of Texas.

24.    Defendant Julie Gonzalez ("Gonzalez") has served as a director of F5 since 2024. Upon information and belief Defendant Gonzalez is a citizen of California.

25.    Defendant Michael Montoya ("Montoya") served as a director of F5 from 2024 until October 9, 2025. Montoya became F5's Chief Technology Operations Officer on October 13, 2025. Upon information and belief, Montoya is a citizen of Washington.

26.    Defendant Edward Cooper Werner ("Werner") was, at all relevant times, the Chief Financial Officer of F5. Upon information and belief, Werner is a citizen of Washington.

27.    Defendant Kunal Anand ("Anand") was, at all relevant times, the Executive Vice President and Chief Innovation Officer of F5. Upon information and belief, Anand is a citizen of Washington.

28.    Defendant Thomas Dean Fountain ("Fountain") was, at all relevant times, the Executive Vice President and Chief Operating Officer of F5. Upon information and belief, Fountain is a citizen of Washington.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 5
Case No.  2:26-cv-00435

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566

1

**DEFENDANTS' DUTIES**

2      29.     By reason of their positions as officers, directors, and/or fiduciaries of F5 and

3  because of their ability to control the business and corporate affairs of F5, Defendants owed F5

4  and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are

5  required to use their utmost ability to control and manage F5 in a fair, just, honest, and equitable

6  manner.  Defendants were and are required to act in furtherance of the best interests of F5and its

7  shareholders so as to benefit all shareholders equally and not in furtherance of their personal

8  interest or benefit.  Each director and officer of the Company owes to F5 and its shareholders the

9  fiduciary duty to exercise good faith and diligence in the administration of the affairs of the

10  Company and in the use and preservation of its property and assets, and the highest obligations

11  of fair dealing.

12      30.     Defendants, because of their positions of control and authority as directors and/or

13  officers of F5, were able to and did, directly and/or indirectly, exercise control over the wrongful

14  acts complained of herein.  Because of their advisory, executive, managerial, and directorial

15  positions with F5, each of the Defendants had knowledge of material non-public information

16  regarding the Company.

17      31.     To discharge their duties, the officers and directors of F5were required to exercise

18  reasonable and prudent supervision over the management, policies, practices and controls of the

19  Company.  By virtue of such duties, the officers and directors of F5 were required to, among

20  other things:

21          a.  Exercise good faith to ensure that the affairs of the Company were conducted

22              in an efficient, business-like manner so as to make it possible to provide the
                highest quality performance of their business;

23          b.  Exercise good faith to ensure that the Company was operated in a diligent,

24              honest and prudent manner and complied with all applicable federal and state
                laws, rules, regulations and requirements, and all contractual obligations,

25              including acting only within the scope of its legal authority; and

26          c.  When put on notice of problems with the Company's business practices and
                operations, exercise good faith in taking appropriate action to correct the

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 6
Case No.  2:26-cv-00435

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566

misconduct and prevent its recurrence.

## SUBSTANTIVE ALLEGATIONS

### A.    Background of the Company

32.    According to its public filings, F5 is a global multicloud application security and delivery company which enables customers to deploy, secure, and operate applications on-premises or via public cloud. The Company operates through three major product portfolios: F5 Distributed Cloud Services, F5 NGINX, and F5 BIG-IP.

33.    In particular, the BIG-IP family of products primarily serves traditional/legacy solutions, providing application security and delivery solutions through packaged software products, including BIG-IP Security, BIG-IP Application Delivery, BIG-IP Automation Tool Chain, BIG-IP Centralized Management, and BIG-IP Next.

### B.    The Individual Defendants Tout F5's Security Measures

34.    Defendant Locoh-Donou praised F5's shift to a "security and software leader" and touted the Company's ability to handle its customer's security, stating, on an October 28, 2024 earning call with analysts:

> ***In a relatively short period of time, we have substantially reshaped F5 from a hardware-centric, single-product company into a security and software leader in today's hybrid multicloud world.*** Our transformation has redefined F5's role beyond the data center, increasing our value to customers, diversifying our revenue and expanding our total addressable market.
>
> . . .
>
> I will speak first to the industry trends. First, hybrid multicloud environments are now the norm and will remain so. According to our latest State of Application Strategy Report, nearly 90% of customers are operating across multiple environments with the benefits of choice clearly outweighing the challenges of managing apps across different deployment models.
>
> Second, applications and the APIs that connect them are becoming increasingly distributed, which means traditional single-environment solutions are not capable of managing and securing them. Third, the number of application instances continues to grow. In fact, it is projected to grow from roughly 2 billion today to 6 billion by 2029.
>
> Fourth, APIs are rapidly proliferating, creating new challenges and risks for

application owners. A recent F5 survey found that nearly 1/3 of customer-facing APIs lack fundamental protection. Fifth, applications and APIs require more security and delivery services today than they used to. In 2016, organizations deployed a minimum of 2 app services to ensure an app remain performant and secure. Today, that number has grown to 13 on average and 27 in total. And finally, the emergence and eventual widespread adoption of AI and AI-powered applications will accelerate and further complicate all of these trends while also leading to new demands related to data ingestion and optimization of GPU environment.

***Individually, these dynamics are driving new complexity, cost and security risks for customers.*** The fact that they are all happening simultaneously is creating significant challenges for the IT teams managing them. ***You have heard us describe the confluence of these dynamics as the ball of fire, and we continue to believe that F5 is uniquely positioned to address it.***

. . .

***F5 delivers the most effective and comprehensive app and API security platform in the industry.*** We enable our customers to consolidate point products, targeting specific threats onto a single integrated platform with a suite of best-in-class capabilities

. . .

The second AI use case we are focused on is AI factory load balancing where we are optimizing the performance and scalability of AI factories with advanced traffic management. Just last week, we announced our exciting collaboration with NVIDIA to enable high-performance software ADC on AI infrastructure.

There are 2 important pieces of this news. ***First, we have enabled BIG-IP Next to run in Kubernetes.*** Enterprises and service providers building AI factories are driving strong demand for advanced semiconductors such as GPUs. AI workloads that run within this infrastructure are running on Kubernetes. ***F5 BIG-IP next for Kubernetes brings our market-leading networking, traffic management and security capabilities to these modern environments.***

Second, we partnered with NVIDIA to ensure that BIG-IP Next for Kubernetes works seamlessly with NVIDIA BlueField-3 DPUs. When combined with BIG-IP Next for Kubernetes, these DPUs effectively become AI accelerators, increasing the performance and security of training and inference workloads, delivering superior AI-driven customer experiences.

35.    Locoh-Donou when on to praise F5's new Chief Innovation Officer, Defendant Anand, who was touted as having significant security experience, stating:

I am pleased to announce that Kunal Anand will lead our product organization as Chief Innovation Officer. After a thorough search that included interviews with leaders from across our industry, it was clear that Kunal had both the experience

and perspective required for the role. Through his prior experience leading the technical and security teams at Imperva, Kunal brings deep domain expertise and technical knowledge across cloud, security, networking, SaaS and AI.

36.     During the same call, Locoh-Donou would again assert that "the 2 decades of expertise that we have amassed in high-performance traffic management and security" were the foundation for ongoing partnerships.  Locoh-Donou would summarize F5's perceived position in the industry as such: "Nobody else in the industry has that expertise. Nobody else in our industry has those capabilities."

37.     The next month, speaking at the on behalf of F5 at the 2024 RBC Capital Markets Global Technology, Internet, Media and Telecommunications Conference, Defendant Werner would highlight the significance of cybersecurity to the Company's customers, including the federal government, stating:

> I mean absolutely, ***that's one of the big draws for our technologies***. We can help customers, whether they're enterprise service provider or the federal government get more efficient in how they deploy their infrastructure, ***security remains of paramount concern, especially in the federal government.*** And so we don't think that that's an area that would be where the demand would be negatively impacted overall from any efficiency initiatives. So I think, potentially, there's a little bit of a tailwind on driving broad efficiency into those environments. ***And then security will continue to be a big driver of demand***.

(Emphasis added).

38.     On January 28, 2025, F5 reported first quarter fiscal 2025 results.  During the corresponding earnings call, Defendant Locoh-Donou touted F5's purported best-in-industry security offering, stating, in pertinent part:

> Over the last several years, we have substantially reshaped F5 for the hybrid and multi-cloud architectures of the AI era. With all its advantages, hybrid multi-cloud also brings with it new challenges. IT teams are being overwhelmed by high cost, crushing complexity and escalating cyber risk, a set of challenges we call the ball of fire.
>
> ***As AI becomes ubiquitous, it will add fuel to the ball of fire, requiring more capacity to handle massive amounts of data, more sophisticated traffic management to deal with complex traffic patterns and enhanced security***

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 9
Case No.  2:26-cv-00435

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566

***capabilities to stay ahead of new security threats.*** Unlike competitors who invested solely in cloud or SaaS, or significantly reduced investment limiting their applicability in a multi-cloud world, over the last several years, F5 innovated across hybrid SaaS and next-generation software and hardware.

As a result, we stand alone with the only complete hybrid multi-cloud portfolio for application security and delivery. We are the only player that can partner with a CIO or CISO to secure and deliver all of their applications and APIs across hybrid, multi-cloud environments.

***

***F5 has the most effective and comprehensive application and API security platform in the industry***

(Emphasis added).

39.     Defendant Locoh-Donou then confidently outlined F5's AI opportunities, which leverage the Company's purported security capabilities and expertise in pertinent part, as follows:

While AI promises to bring massive productivity benefits, it is also creating new compliance, infrastructure, networking and security challenges for customers. AI is already exacerbating the ball of fire and accelerating the pressure to simplify hybrid multi-cloud deployments.

Our early AI opportunities are concentrated on 3 areas of high-performance data delivery and security. ***The dominant AI opportunity for F5 thus far is delivering and securing data for both AI model training and inference.*** AI model training requires higher performance traffic management to ensure the efficiency, speed and reliability of lengthy and expensive training processes. ***Customers are using F5 BIG-IP to move incredible amounts of data at high speed to and from their data stores, providing greater efficiency for the training process***.

. . .

***The second AI opportunity we see today leverages our market-leading WAP solution for secure AI inferencing.*** APIs connect the AI ecosystem and AI APIs are subject to the same security challenges and vulnerabilities as traditional APIs. F5's WAP solutions protect hybrid and multi-cloud applications with functionality that spans from API discovery to API security, which is essential for AI workloads. ***Customers are leveraging F5's complete security portfolio to protect their AI workloads, including BIG-IP, NGINX and F5 distributed cloud services. We expect secure AI inferencing will become a bigger opportunity for F5 as organizations move from experimenting to leveraging AI inferencing at scale***.

(Emphasis added).

40.     On April 28, 2025, Defendants unveiled their second quarter results. During the associated earnings call, Defendant Locoh-Donou again praised F5's security, claiming the

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 10
Case No. 2:26-cv-00435

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566

Company "has the most effective and comprehensive application and API security platform in the industry." While responding to questions, Locoh-Donou unequivocally boasted of F5's dominance in security:

> So the AI opportunity, when you look at it in aggregate, we're really happy with where we are. It so happened that the big challenges in AI are moving data and moving data securely. And we happen to have the best technology in the industry to move data security and at real speed for customers. So the opportunity is in front of us and I think will be durable over time.

41.    On May 14, 2025, Defendant Anand and Werner presented on behalf of F5 at the 53rd Annual JPMorgan Global Technology, Media and Communications Conference. During the interview, Defendant Anand discussed the significance of security to its customers and how the Company differentiates itself from its competitors with respect to security, in pertinent part, as follows:

> The second area is securing access and securing the information that's going to and from those large language models, whether they're locally hosted or in the cloud. And for that, that's where we introduced the F5 AI gateway effectively sit between these applications and APIs as well as these large language models, whether they're deployed somewhere else or locally. And then last but not least, is around load balancing specifically load balancing these AI clusters. How does information get to these clusters and then intra-load balancing as well. So we recently announced the GA of what we're calling BIG-IP next for Kubernetes that runs on NVIDIA's BlueField-3 DPUs, which now gives organizations the ability to do delivery and security within an AI factory or inside of an AI super pod. So we really think that those 3 opportunities are very meaningful.
>
> ***
>
> ***What we've been able to do with a lot of investment and obviously, a lot of work is bridging a lot of the security use cases along with the load balancing and traffic management and that includes application security, API security, bot protection. We really believe that the infusion of security and delivery is fundamentally important. So for us, we think that, that investment in building out that platform play is a core differentiator as it relates to our traditional competitors.***

(Emphasis added).

42.    On September 9, 2025, Defendants presented at Goldman Sachs Communacopia and Technology Conference 2025. During the interview, Defendant Locoh-Donou touted the

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 11
Case No. 2:26-cv-00435

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566

strength of F5's security offerings and capabilities during the following pertinent exchanges:

> So the complexity that customers face today comes from a couple of what we consider to be secular trends. The first one is that most large enterprises now have embraced hybrid and multi-cloud architectures. They need the flexibility of being in multiple infrastructure environments to deploy their apps in the most efficient way and different apps need different kinds of environment. But of course, with that flexibility of being in multiplying cloud environments comes a complexity of securing and delivering apps across these environments. So that's first source of complexity.
>
> . . .
>
> **The reason we're very well positioned to address that is because we made a strategic choice several years ago to remain entirely focused on application and API delivery and security. But within that category, to invest across hardware, software and Software as a Service, such that we could secure and deliver all these apps and APIs across all these infrastructure environments.**

43.     Defendant Locoh-Donou further emphasized the significance of the continued security opportunity for F5 stating that "Our focus over the next 12, 24 months, #1 is our application delivery and security platform…" and that the "application delivery and security platform and making that real for our customers is kind of the #1 priority."

## C.     **The Truth Emerges**

44.     On October 15, 2025, Defendants published a press release announcing a significant security breach that they had purportedly uncovered more than two months prior to the disclosure.  In pertinent part, Defendants detailed the Security Breach and its exposure as follows:

> **In August 2025, we learned a highly sophisticated nation-state threat actor maintained long-term, persistent access to, and downloaded files from, certain F5 systems. These systems included our BIG-IP product development environment and engineering knowledge management platforms.** We have taken extensive actions to contain the threat actor. Since beginning these activities, we have not seen any new unauthorized activity, and we believe our containment efforts have been successful.
>
> In response to this incident, we are taking proactive measures to protect our customers and strengthen the security posture of our enterprise and product environments. We have engaged CrowdStrike, Mandiant, and other leading

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566

1    cybersecurity experts to support this work, and we are actively engaged with law
     enforcement and our government partners.
2    We have released updates for BIG-IP, F5OS, BIG-IP Next for Kubernetes, BIG-
3    IQ, and APM clients. More information can be found in our October 2025 Quarterly
     Security Notification. We strongly advise updating to these new releases as soon as
4    possible.
5    What we know at this time, based on our investigation of available logs:
6
       • ***We have confirmed that the threat actor exfiltrated files from our BIG-IP
7         product development environment and engineering knowledge management
8         platforms. These files contained some of our BIG-IP source code and
          information about undisclosed vulnerabilities we were working on in BIG-
9         IP***. We have no knowledge of undisclosed critical or remote code
          vulnerabilities, and we are not aware of active exploitation of any undisclosed
10        F5 vulnerabilities.

11   (Emphasis added).

12       45.    The corresponding 8-K filing provided some additional details concerning both

13   the company's purported discovery of the Security Breach and the timing of the disclosure itself,

14   stating, in pertinent part:

15       On August 9, 2025, F5, Inc. . . . learned that a highly sophisticated nation-state
         threat actor had gained unauthorized access to certain Company systems.
16
17                                          . . .

18       On September 12, 2025, the U.S. Department of Justice determined that a delay in
         public disclosure was warranted pursuant to Item 1.05(c) of Form 8-K. F5 is now
19       filing this report in a timely manner.

20       As of the date of this disclosure, this incident has not had a material impact on the
         Company's operations, and the Company is evaluating the impact this incident may
21       reasonably have on its financial condition or results of operations.

22
23       46.    Investors and analysts reacted immediately to F5's revelation. The price of F5's

24   common stock declined dramatically. From a closing market price of $343.17 per share on

25   October 14, 2025, F5's stock price fell to $295.35 per share on October 16, 2025, a decline of

26   about 13.9% in the span of just two days.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 13
Case No.  2:26-cv-00435

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566

47.     A number of well-known analysts who had been following F5 highlighted the initial disclosure, but also emphasized that little was disclosed as to the potential impacts to F5's business. For example, Raymond James, while reiterating their market perform rating but highlighting a "negative" sentiment, summarized that "F5 disclosed a material security incident via an 8K that stated the company learned on August 9 that a nation-state threat actor gained long-term persistent access (Bloomberg reports at least 12 months) to some company systems." The analyst went on to highlight that "it's early to tell what impacts may come to results, customer behavior or legal scrutiny the company may come under. That said, our worry is the unknown impacts given the long-term access by the threat actor to undisclosed vulnerabilities along with the BIG-IP development environment."

48.     In the evening of October 27, 2025, the Individual Defendants caused F5 to publish its fourth quarter fiscal year 2025 results; notably highlighting a significant impact to the company's business going forward. In pertinent part Defendant Locoh-Donou provided full-year results and highlighted the steps taken following the discovery of the Security Breach, stating, in pertinent part:

> In FY '25, we maintained our strong profitability, delivering gross margins of 83.6%, up 80 basis points over FY '24, an operating margin of 35.2%, up 160 basis points over FY '24. This performance resulted in record free cash flow of $906 million, up 19% compared to FY '24 underscoring the strength of our financial model and execution.
>
> Our FY '25 results demonstrate the power of our platform and our strategic role in the marketplace. They also strengthen our confidence in our vision and road map for the future. Our immediate focus, however, has been on our incident response and I will speak to our priorities and offer an update on where we are now.
> Upon identifying the threat on August 9, our team immediately activated our incident response process. Our priorities were clear. First, contain the threat actor, initiate a thorough investigation and take immediate and urgent action to strengthen F5's security posture. While the investigation will continue and the work of bolstering our security posture will expand, our initial steps have been successful. Second, we prioritized delivering reliable software releases to address all undisclosed high vulnerabilities in BIG-IP code as quickly as possible. Through the exceptional efforts of our engineering and support teams, we achieved this, enabling thousands of customers to promptly deploy critical updates upon

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT - 14
Case No. 2:26-cv-00435

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566

disclosure.

Our customers are moving quickly to update their BIG-IP environment, and a significant number of our largest customers have completed their updates with minimal disruption. As an example, a North American technology provider completed updates to 814 devices in a 6-hour window in the first weekend. Customers have expressed appreciation for our transparency, the thoroughness of the information we provided and the clarity in the steps they need to take to improve the security of their environment.

***

Our third priority is raising the bar on security across all aspects of our business. We are acutely aware of the increasing sophistication of attackers and the fact that the threat surface is expanding rapidly. Each year, over the last several years, we have aggressively increased our investment in security, and we are making further significant investment this year and beyond.

To further this work, Michael Montoya, a recognized cybersecurity expert and former member of our Board, has joined F5 as Chief Technology Operations Officer. Michael brings deep operational expertise and will drive the execution of a robust road map to further enhance security across our internal processes, environments and products. Our goal across all these actions is to better protect our customers and we believe F5 will be a stronger partner to customers because of it.

We know customers will judge us by how we respond to this incident. Throughout this process, we have been committed to transparent customer communication at every step, reflecting lessons learned from how others have navigated similar challenges. ***We acknowledge that we may see some near-term impact to our business.*** We are fully focused on mitigating that impact while doubling down on the value we deliver to our customers.

(Emphasis added).

49.    Defendant Werner provided the Company's underwhelming first quarter and full fiscal year 2026 outlook, detailing previously undisclosed impacts due to the Security Breach, in pertinent part:

As we enter FY '26, we see several persistent demand drivers, including hybrid multicloud adoption driving expansion across our platform, the continuing strong systems refresh opportunity with more than half of our installed base on legacy systems nearing end of software support, growing systems demand beyond tech refresh for data sovereignty and AI readiness use cases and a return to growth in revenue from our SaaS and managed services with the transition of legacy offerings largely completed in FY '25.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 15
Case No.  2:26-cv-00435

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566

These drivers in our current pipeline support mid-single-digit revenue growth in FY '26 against our exceptional 10% growth in FY '25. However, we also anticipate some near-term disruption to sales cycles as customers focus on assessing and remediating their environments. Taking this into account, we are guiding FY '26 revenue growth in the range of 0% to 4% with any demand impacts expected to be more pronounced in the first half, before normalizing in the second half.

Moving to our operating model. We recognize the revenue guide may lead to a modest impact to our operating margin near term. We are committed to driving continued operating margin leverage and believe any demand impact is likely to be short term and therefore any effect on our operating model would also be temporary.

\With that context, we estimate FY '26 gross margin in a range of 83% to 83.5%. We estimate FY '26 non-GAAP operating margin to be in the range of 33.5% to 34.5% with operating margins lowest in our fiscal Q2 due to payroll tax resets in January and costs associated with our large customer event in March. We expect our FY '26 non-GAAP effective tax rate will be in a range of 21% to 22%. And we expect FY '26 EPS in a range of $14.50 to $15.50. Finally, we intend to continue to use at least 50% of our free cash flow towards share repurchases in FY '26.

Turning to our Q1 outlook. We expect Q1 revenue in a range of $730 million to $780 million. This is the wider range than we would typically guide, reflecting the potential for some near-term disruption to sales cycles. While we are not guiding revenue mix, we expect Q1 software to be down year-over-year given the strong growth in the year-ago period. We expect non-GAAP gross margin in a range of 82.5% to 83.5%. We estimate Q1 non-GAAP operating expenses of $360 million to $376 million. We expect Q1 share-based compensation expense of approximately $61 million to $63 million. We anticipate Q1 non-GAAP EPS in a range of $3.35 to $3.85 per share.

50.    Locoh-Donou elaborated further on the continuing impact of the Security Breach during the call, noting that "Based on these trends, we felt the trajectory of the business going into 2026 was more in the mid-single-digit growth. But we said we are guiding to 0% to 4% growth for 2026 based on what we see as potential near-term impact related to the security incident."

51.    Locoh-Donou further detailed exactly how disruptive the Security Breach had been:

What we have in there, Meta, is really ***3 categories of things that could create near-term disruption. The first is that we have our own resources, our field resources and sales resources over the last few couple of weeks, and I think that***

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 16
Case No.  2:26-cv-00435

**BADGLEY MULLINS TURNER** PLLC
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566

*will go on for a few more weeks, have really been focused on attending customers, helping them upgrade their environments, remediate issues, answer any questions, et cetera. And inevitably that takes time away from normal sales cycles.* And the same is true for customers who are putting a lot of resources on upgrading their BIG-IPs, ensuring their environment is in the right place and that takes time away from considering the next project. So that is a short-term disruption around allocation of resources both at F5 and with our customers.

*There's a second potential disruption that we have considered in our guidance which is that given the visibility that this security incident has had, it would be natural that in some of our customers at an executive level, we may see some delays of approvals or delays of deals or additional approval* as customers across a complex organization make sure that they want to be reassured that their project should move forward and they have no further interrogation around that. That's the second consideration.

*And then the third one is that potentially for some of our customers there may be some projects that they were going to move forward with, and they end up deciding not to do that. And we have considered that as a third potential impact.* Now, I want to be clear, the -- everything I've just talked about, as you know, Meta, more than 70% of our revenues are recurring. Everything I've just talked about with the impact that would be mostly with new projects or new footprint acquisition. And so far, it is very early days because this was disclosed only 2 weeks ago. We haven't seen any of the impacts that I'm talking about, but we are very prudent about this because we are very, very early after the disclosure and the interaction with customers.

(Emphasis added).

52.    Investors and analysts again reacted promptly to F5's revelations. The price of F5's common stock declined dramatically. From a closing market price of $290.41 per share on October 27, 2025, F5's stock price fell to $258.76 per share on October 28, 2025, a decline of an additional 10.9% in the span of two days.

53.    A number of well-known analysts who had been following F5 lowered their price targets in response to F5's disclosures. For example, J.P. Morgan, while dropping its price target nearly 8%, summarized the earnings call, noting "the biggest focus on the earnings call and relative to the outlook shared by management was the recent security breach, which has led F5 to take corrective measures to ensure protection of customer environments."  The analyst further highlighted the company's disappointing guidance: "given the resources diverted to addressing

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT - 17
Case No.  2:26-cv-00435

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566

1   customer needs as well as the potential ramifications in terms of customers delaying / pausing

2   projects against the backdrop of this breach, F5 is embedding significant conservatism in its guide

3   for F1H26 with expectations of potential revenue impact across both Hardware and Software."

4                      **DERIVATIVE AND DEMAND ALLEGATIONS**

5          54.    Plaintiff brings this action derivatively in the right and for the benefit of F5 to

6   redress the breaches of fiduciary duty and other violations of law by Defendants.

7          55.    Plaintiff will adequately and fairly represent the interests of F5and its shareholders

8   in enforcing and prosecuting its rights.

9          56.    The Board currently consists of the following ten (10) directors: defendants

10  Higginson, Budnik, Buse, Combes, Mehta, Dreyer, Erwin, Gonzalez, McReynolds, and Loco-

11  Donou (the "Director-Defendants"). Plaintiff has not made any demand on the present Board to

12  institute this action because such a demand would be a futile, wasteful, and useless act. Plaintiff

13  needs only to allege demand futility as to four of the five of the directors that were on the Board

14  at the time this action was filed.

15         57.    Demand is excused as to all of the Director-Defendants because each one of them

16  faces, individually and collectively, a substantial likelihood of liability as a result of the schemes

17  they engaged in knowingly or recklessly to engage in and/or cause the Company to engage in the

18  misconduct alleged herein and to make and/or cause the Company to make false and misleading

19  statements and omissions of material fact, all of which renders the Director-Defendants unable

20  to impartially investigate the charges and decide whether to pursue action against themselves and

21  the other perpetrators of the schemes.

22         58.    In complete abdication of their fiduciary duties, the Director-Defendants either

23  knowingly or recklessly caused or permitted F5 to engage in the misconduct alleged herein and

24  to issue materially false and misleading statements. Specifically, the Director-Defendants caused

25  F5 to issue false and misleading statements which were intended to make F5's internal controls

26  and security offerings appear more attractive than they actually were. Moreover, the Director-

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 18
Case No. 2:26-cv-00435

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566

Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not independent or disinterested, and demand upon them is futile, and thus, excused.

59. Moreover, Locoh-Donou is not independent due to his employment with F5 as its CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits. In addition, according to the Company's January 26, 2026 Proxy Statement (the "2026 Proxy") the Board has determined that defendant Locoh-Donou is not an independent director within the meaning of NASDAQ rules because he has a relationship that would interfere with the exercise of his independent judgment in carrying out the responsibilities of a director.

## COUNT I

### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY

60. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

61. As alleged in detail herein, each of the Defendants had a duty to ensure that F5 disseminated accurate, truthful and complete information to its shareholders.

62. Defendants violated their fiduciary duties of loyalty and good faith by causing or allowing the Company to disseminate to F5 shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings, press releases, conference calls, and other public statements and disclosures as detailed herein. These actions could not have been a good faith exercise of prudent business judgment.

63. Defendants further violated their fiduciary duties by failing to properly maintain and supervise the requisite internal controls at F5, which lead to the alleged misconduct herein.

64. As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 19
Case No. 2:26-cv-00435

**BADGLEY MULLINS TURNER** PLLC
19910 50ᵗʰ Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

**COUNT II**

**AGAINST ALL DEFENDANTS FOR UNJUST ENRICHMENT**

65.    Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

66.    By their wrongful acts and omissions, Defendants were unjustly enriched at the expense of and to the detriment of F5.

67.    Plaintiff, as a shareholder and representative of F5, seeks restitution from Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants, and each of them, as a result of their wrongful conduct and fiduciary breaches.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

B.    Directing F5 to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

C.    Awarding to F5 restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by Defendants;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

1       E.      Granting such other and further relief as the Court deems just and proper.

2  **JURY DEMAND**

3       Plaintiff demands a trial by jury.

4

5  DATED: February 5, 2026              Respectfully submitted,

6

7                           **BADGLEY MULLINS TURNER PLLC**

8                           */s/ Duncan C. Turner*

9                           Duncan C. Turner, WSBA No. 20597

10                           19910 50th Avenue W., Suite 103
                         Lynnwood, WA 98036
                         Tel: (206) 621-6566

11                           Email: dturner@badgleymullins.com

12                           *Liaison Counsel for Plaintiff*

13

14                           THE WEISER LAW FIRM, P.C.
                         JAMES M. FICARO

15                           200 Barr Harbor Dr., Suite 400
                         West Conshohocken, PA 19428

16                           Berwyn, PA 19312
                         Telephone:  (610) 225-2677

17                           Facsimile:  (610) 408-8062
                         Email: jmf@weiserlawfirm.com

18                           *Counsel for Plaintiff*

19

20

21

22

23

24

25

26

VERIFIED SHAREHOLDER DERIVATIVE
COMPLAINT - 21
Case No.  2:26-cv-00435

**BADGLEY MULLINS TURNER PLLC**
19910 50th Ave. W., Suite 103
Lynnwood, WA 98036
TEL 206.621.6566